IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| REPRESENTATIVE JUSTIN JONES, in his personal capacity, | ) | |
| Plaintiff, | ) | NO. 3:23-cv-01033 |
| v. | ) | JUDGE RICHARDSON |
| REPRESENTATIVE CAMERON SEXTON, in his individual capacity and in his official capacity as the Speaker of the Tennessee House of Representatives; TAMMY LETZLER, in her individual capacity and in her official capacity as the Chief Clerk for the Tennessee House of Representatives; BOBBY TROTTER, in his individual capacity and in his official capacity as the Chief Sergeant-at-Arms for the Tennessee House of Representatives; and DANIEL HICKS, in his individual capacity and in his official capacity as the Assistant Chief Clerk and Parliamentarian for the Tennessee House of Representatives, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Representative Justin Jones[1] ("Plaintiff") initiated this lawsuit by filing a complaint (Doc. No. 1, "Complaint") in this Court naming as Defendants Representative Cameron Sexton ("Defendant Sexton"), Chief Clerk Tammy Letzler ("Defendant Letzler"), Chief Seargent-At-Arms Bobby Trotter ("Defendant Trotter"), and Assistant Chief Clerk and Parliamentarian Daniel Hicks ("Defendant Hicks"). On November 3, 2023, Plaintiff filed an amended complaint (Doc. No. 26, "Amended Complaint"). Defendants filed a joint motion to dismiss (Doc. No. 36) the

[1] Plaintiff brings these claims in his personal, and not his official, capacity.

Amended Complaint on December 8, 2023. Plaintiff thereafter sought leave to file a supplemental and amended complaint (Doc. No. 47). After briefing, the Court granted Plaintiff leave to file a supplemental and amended complaint in an order (Doc. No. 51) dated October 30, 2024; that same day, the supplemental and amended complaint (Doc. No. 52, "SAC") was filed and became the operative complaint in this case. Accordingly, Defendants' initial motion to dismiss (Doc. No. 36) the Amended Complaint was denied as moot (Doc. No. 61). On November 27, 2024, Defendants filed a "Motion to Dismiss [the SAC]" (Doc. No. 55, "Motion"), and accompanying memorandum (Doc. No. 55-1, "Opening Brief"). On December 30, 2024, Plaintiff filed a response (Doc. No. 58, "Response") in opposition to the Motion. On January 13, 2025, Defendants filed their reply (Doc. No. 63, "Reply") in further support of the Motion.[2]

Now pending before the Court is Defendants' Motion (Doc. No. 55) wherein Defendants seek dismissal of the SAC under Rule 12(b)(1) and 12(b)(6). For the reasons stated herein, the Motion will be **GRANTED,** and this action will be dismissed in an accompanying order.

ALLEGED FACTS[3]

This case arises out of the conduct of Plaintiff, a Black Representative in the Tennessee House of Representatives ("House"), and Defendants: Defendant Sexton, Speaker of the House and a Representative in the House; Defendant Letzler, Chief Clerk of the 113th House; Defendant

---

[2] The Court notes that Defendants filed two replies, one at Docket No. 62 and one at Docket No. 63. The replies appear to be identical. Where applicable, the Court cites to the later in time reply filed at Docket No. 63.

[3] The facts herein are taken from the SAC, which (as noted above) is the operative complaint in this case. For purposes of the instant Motion, the facts in the SAC are accepted as true, even though in some (but not all) contexts the facts are identified as being alleged; in those contexts, the Court has a reason to refer to them as "alleged" even though they are being taken as true and not *merely* alleged for purpose of the instant Motion. On the other hand, to the extent that allegations in the SAC are not actually factual allegations but instead legal conclusions, conclusory assertions, and the like, they are not taken as true, and the Court will (where necessary) make clear that they are not being taken as true but instead are set forth merely to make clear as appropriate what a party claims to be true.

Trotter, Chief Sergeant-At-Arms of the 113th House; and Defendant Hicks, the Assistant Chief Clerk and Parliamentarian for the 113th House. (Doc. No. 52 at ¶¶ 9-14).[4]

On March 27, 2023, a shooting occurred at The Covenant School, a private school in Nashville, Tennessee. (*Id.* at ¶ 22). On March 30, 2023, the House met in session. (*Id.* at ¶ 26). During that session, in retaliation for Plaintiff's attempts to "speak and to be heard" in the session, Plaintiff's "voting machine at his desk was turned off." (*Id.* at ¶ 30). After Plaintiff's voting machine was turned off, Plaintiff, along with Representatives Justin Pearson, who is Black, and Gloria Johnson, who is white, entered the well of the House. (*Id.* at ¶ 31). Plaintiff, along with Representative Pearson, both spoke from the well's podium. (*Id.*).

After the events in the well, Plaintiff was removed from all of his "committee assignments" on April 3, 2023. (*Id.* at ¶ 36, hereinafter at times "committee removals"). Plaintiff was informed of his removals via a letter from Defendant Letzler, which read "[y]ou have been removed from all House standing committees and subcommittees and committees on which you serve as designee," including the Government Operations Committee. (*Id.* at ¶ 37). The letter was "sent on [Defendant Sexton's] letterhead and signed by Defendant Letzler." (*Id.*). On the same day, Plaintiff was informed by a notice from Defendant Sexton that Defendant Sexton "intended to hold expulsion proceedings against [Plaintiff]." (*Id.* at ¶ 45). Both Representatives Pearson and Johnson faced expulsion proceedings as well. (*Id.* at ¶ 41). The expulsion proceedings took place on April 6, 2023. (*Id.* at ¶¶ 46-53). In the course of these proceedings, the Rules of the House were suspended so that "Plaintiff . . . could be recognized for twenty-minute, question-and-answer periods relating to the expulsion resolutions against [him]." (*Id.* at ¶ 46).

---

[4] The State of Tennessee was named as a Defendant in the original complaint but not the Amended Complaint or the SAC.

On April 6, 2023, House Resolution 65 (concerning the expulsion of Plaintiff) was brought to a vote, and "the House voted to expel [Plaintiff] by a vote of 72 yeas to 25 nays." (*Id.* at ¶ 51). Representative Pearson was also expelled pursuant to a separate house resolution on the same day. (*Id.*). The vote to expel Representative Johnson failed. (*Id.* at ¶ 53). As a result of this expulsion, Plaintiff was "deprived of his full year of experience for purposes of calculating his level of seniority as a member of the House." (*Id.* at ¶ 116). Plaintiff suffered various harms resulting from the denial of this year of service, including impacts to his eligibility for participation in the Tennessee Consolidated Retirement System ("TCRS") and a lapse of his health insurance coverage. (*Id.* at ¶¶ 121, 182).

Plaintiff's absence from the House lasted four days. On April 10, 2023, the Metropolitan Council of Nashville and Davidson County reinstated Plaintiff to his House seat. (*Id.* at ¶ 58). Plaintiff subsequently won a special election to his House seat on August 3, 2023. (*Id.* at ¶ 62). Upon his return to the House, Plaintiff suffered a "deni[ial of] more than six months of participation in the Government Operations Committee due to his protest" (hereinafter, "GOC-seat denial") before being restored to his seat on that committee, while Representative Gloria Johnson, who is white, "was allowed to return to her committee assignments" despite also being "censured and removed from her committee seats." (*Id.* at ¶¶ 39, 186(c)).

After Plaintiff's return to the House, on April 27, 2023, Plaintiff "questioned a Republican sponsored bill as threatening to 'bully' Tennessee public school students." (*Id.* at ¶ 186(b)). Plaintiff was "censured, objected to, and ignored," for his conduct, while another Representative, Bob Freeman—who is white—"was not censured or objected to" for detailing similar objections to the bill. (*Id.*).

In the meantime, Tennessee Governor Bill Lee called the House into "extraordinary session" beginning on August 21, 2023. (*Id.* at ¶ 65). The session was "to consider and act upon legislation regarding eighteen enumerated topics relating to public safety, including issues regarding school and firearm safety." (*Id.*). The August 2023 Special Session began with the adoption of the House Rules of Order for the Special Session ("2023 Special Session Rules").[5] (*Id.* at ¶ 66). The 2023 Special Session Rules were first recommended by the House Ad Hoc Committee, before being adopted by the full House. (*Id.*).[6]

On August 28, 2023, Defendant Sexton ruled the Plaintiff "out of order" twice under the 2023 Special Session Rules. (*Id.* at ¶¶ 79-80). On Defendant Sexton's second "out of order" ruling, Defendant Hicks informed Defendant Sexton that because Plaintiff had been ruled out of order twice, Plaintiff was now "subject to censure under the 2023 Special Session Rule 18." (*Id.* at ¶ 81). The House voted to sustain the second "out of order" ruling by a vote of 70 yeas and 20 nays, and

---

[5] Tennessee House of Representatives, 113th General Assembly, *Report of the Ad Hoc Committee on Rules First Extraordinary Session*, https://perma.cc/ZY63-Q9BA.

[6] Despite the allegations in the SAC that Defendant Sexton "implement[ed]" the 2023 Special Session Rules, the Court takes judicial notice that the 2023 Special Session Rules were adopted by the House. *Compare* Doc. No. 52 at ¶ 66 *with* Tennessee General Assembly, House Floor Session—1st Legislative Day—1st Extraordinary Session at 8:05 (Aug. 21, 2023), https://tnga.granicus.com/player/clip/28820?view_id=705&redirect=true&h=70d48f42508633c75214628 eff403d18.

The Court is able *sua sponte* to take judicial notice of the contents of a .edu website or a government website, and this website is a government website. *See e.g.*, *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009) (taking judicial notice of contents of the Bureau of Prisons' website); *United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) ("The Court may take judicial notice sua sponte."); *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'") (quoting Fed. R. Evid. 201(b)); *Caner v. Autry*, 16 F. Supp. 3d 689, 693 n.3 (W.D. Va. 2014) (taking judicial notice of various facts on university .edu website); *Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 n.1 (M.D. Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website."); *Oak Ridge Envtl. Peace All. v. Perry*, 412 F. Supp. 3d 786, 810 (E.D. Tenn. 2019) ("Information taken from government websites is self-authenticating under Fed. R. Evid. 902, and courts may accordingly take judicial notice of the information found on these websites.").

under the rules, Plaintiff was "prevented from speaking" "for the full remainder of the legislative day on August 28, 2023." (*Id.* at ¶¶ 82-83). "[Plaintiff] was thus silenced by Defendant Sexton and the House Republican supermajority." (*Id.* at ¶ 83).

Plaintiff also alleges that his rights were violated under the rules promulgated in the first House session of 2024 ("2024 New Rules")[7] on January 9, 2024. (*Id.* at ¶ 88).[8] These rules were "created to silence [Plaintiff]" and "Defendant Sexton selectively enforced the newly drafted rules against [Plaintiff] to silence [Plaintiff]." (*Id.*). Under the 2024 New Rules, "Defendant Sexton continued to repeatedly and consistently violate [Plaintiff's] rights by silencing him and preventing him from speaking on behalf of his constituents and by singling him out among all House members for targeted and unequal treatment, including unequal and disparate enforcement of the House Rules of debate and order." (*Id.* at ¶ 109). More specifically, and with respect to Defendant Sexton in particular, Defendant Sexton "censured [Plaintiff] by ruling [Plaintiff] 'out of order' under the

---

[7] Tennessee House of Representatives, 113th General Assembly, Permanent Rules of Order, https://perma.cc/LN6U-STYC.

[8] Plaintiff also seems to suggest that "Defendants drafted, passed, and enforced" the 2024 New Rules. (Doc. No. 52 at ¶ 88). The Court notes and takes judicial notice that the 2024 New Rules were adopted by the House as a whole. Jonathan Mattise, *New Tennessee House rules seek to discourage more uproar after highly publicized expulsions*, ASSOCIATED PRESS (Jan. 10, 2024), https://apnews.com/article/tennessee-house-rules-debate-7e9483d818e8e337a6b708dfe5f7f2b9 ("The Republican-run Tennessee House on Wednesday installed new rules limiting how long lawmakers can debate bills and restricting members deemed 'out of order' from speaking."); Vivian Jones, *Tennessee House adopts new rules setting strict debate limits, banning visual aids*, TENNESSEAN (Jan. 10, 2024), https://www.tennessean.com/story/news/politics/2024/01/10/tennessee-house-new-rules-adopted-on-debate-visual-aids-silencing-members/72174366007/ ("After nearly two hours of debate, the Tennessee House of Representatives formally adopted new rules Wednesday…[t]he controversial rules package also includes a measure allowing the House to silence members out of order during a House session. Members voted 70 to 19…to adopt the rules, first recommended by the House Rules Committee on Monday."); *New England Health Care Employees Pension Fund v. Ernst & Young. LLP,* 336 F.3d 495, 501 (6th Cir.2003) ("a court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."); Fed. R. Evid. 201 (providing that "[a] court may take judicial notice, whether requested or not" of a "judicially noticed fact" which "must be one not subject to reasonable dispute," a requirement satisfied if the fact is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

2024 New Rules . . . no fewer than seven times[] during the 2024 Session, which resulted in [Plaintiff] being silenced each time, including being silenced for a period of up to two legislative days," compared to "zero times for any Republican, non-Black colleagues, even when they commit[ted] similar, or the same behavior." (*Id.* at ¶¶ 91, 186(d)). Further, Defendant Sexton on two occasions, on February 26, 2024 and again on April 18, 2024, used his "power to refuse to acknowledge [Plaintiff] for over two hours of floor debate." (*Id.* at ¶¶ 105-07, 185(e)). Further, Defendant Hicks and Defendant Sexton "abused their power by throwing out [Plaintiff's] proposed amendment to House Joint Resolution 810."[9] (*Id.* at ¶ 93). With respect to Defendant Hicks specifically, "acting in his position as Assistant Chief Clerk," Defendant Hicks "announced that Plaintiff's amendment was out of order and did not allow [Plaintiff] to speak on the amendment" under the 2024 New Rules. (*Id.* at ¶¶ 91, 93).

Defendants took their offending actions in order to "block[]" Plaintiff "from expressing views on critical issues that [Plaintiff] was duly elected to express, ensuring that viewpoints dissenting from [Defendants'] own are silenced, neither heard nor spoken." (*Id.* at ¶ 1).

<div align="center">PLAINTIFF'S CLAIMS</div>

Plaintiff brings six "claims for relief," which the Court will refer to respectively as "Claim I," "Claim II," and so forth. All claims are brought under 42 U.S.C. § 1983 (at times, "Section 1983"), and Plaintiff purports to bring Claim I and Claim II additionally under Tennessee Constitution, Article I, §19.

Claim I alleges that Plaintiff's rights were violated under the First Amendment to the U.S. Constitution and Article I of the Tennessee Constitution, by (1) Plaintiff's committee removals

---

[9] The Court notes, merely for background purposes, that House Resolution 810 related "to sending the National Guard to Texas." (Doc. No. 52 at ¶ 93).

and the GOC-seat denial; (2) Plaintiff's expulsion from the House; (3) the adoption of the 2023 Special Session Rules; and (4) the application to Plaintiff of the 2023 Special Session Rules and 2024 New Rules. (*Id.* at ¶¶ 124-137). Plaintiff further alleges that Defendants "intend to make or threaten to make ongoing use of the 2024 New Rules, or similar rules, to continue to . . . silence [Plaintiff] in future legislative sessions." (*Id.* at ¶ 134). Under Claim I, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

Claim II alleges that the 2024 New Rules are facially unconstitutional under Article I of the U.S. Constitution and Article I of the Tennessee Constitution. (*Id.* at ¶¶ 138-45). Plaintiff alleges that Defendants "intend to and will implement and enforce the New Rules or other, similar rules in future legislative sessions to further chill, silence, and prevent such constitutionally protected speech by [Plaintiff] and other Representatives with whom they disagree." (*Id.* at ¶ 143). Under Claim II, Plaintiff seeks declaratory and injunctive relief.

Claim III alleges that the manner of the committee removals, the GOC-seat denial, and Plaintiff's expulsion from the House, including the lack of adequate notice and opportunity to be heard and the denial of an impartial hearing during that expulsion, violated Plaintiff's right to procedural due process under the Fourteenth Amendment to the U.S. Constitution. (*Id.* at ¶¶ 146-70).[10] Under Claim III, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

Claim IV alleges a claim for violation of Plaintiff's procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. (*Id.* at ¶¶ 171-82). More particularly Plaintiff alleges that "as a result of his unconstitutional expulsion, [Plaintiff] temporarily lost health insurance coverage, and will not have this year of public service count toward [Plaintiff's]

---

[10] As discussed in more detail in a footnote below, the Court understands Claim III to be a claim for violation of Plaintiff's *procedural* due process rights.

retirement benefits." (*Id.* at ¶ 182). Under Claim IV, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

Claim V alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by engaging in disparate racial treatment. (*Id.* at ¶¶ 183-192). Claim V alleges that "Defendants denied equal protection to [Plaintiff] when they treated [Plaintiff] differently than [Defendants] treated similarly situated white House members for the same conduct." (*Id.* at ¶ 185). Specifically, Plaintiff points to Plaintiff's expulsion from the House, Plaintiff's treatment during an April 27, 2023 House session, denial of committee assignments to Plaintiff after his return to the House on April 10, 2023, the adoption of the 2024 New Rules, the application to Plaintiff of the 2024 New Rules, and Defendant Sexton's refusal to acknowledge Plaintiff during floor debates in February 2024 and April 2024. (*Id.* at ¶ 186). Under Claim V, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

Finally, Claim VI asserts that Plaintiff's expulsion from the House constitutes a bill of attainder in violation of Article I of the U.S. Constitution. (*Id.* at ¶¶ 193-201). Plaintiff alleges that "the downstream consequences of that expulsion, such as the loss of committee assignments, seniority, and other benefits provided to members of the Tennessee legislature—have caused and will continue to cause ongoing irreparable harm to [Plaintiff]." (*Id.* at ¶ 201). Under Claim VI, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

As noted, Plaintiff seeks injunctive relief, declaratory relief and monetary relief. As for injunctive relief, Plaintiff asks this Court (1) to enjoin "Defendants from punishing or in any way preventing [Plaintiff] in the future from speaking on the floor of the House or otherwise in his capacity as a duly elected member of the House, including by any use of the [2024 New Rules] or other, similar rules;" and (2) to enjoin and require "Defendants to fully and immediately restore

(including retroactively, where necessary) [Plaintiff] to the full rights and benefits of his elected office of which he has been and continues to be deprived as a result of his unconstitutional and illegal expulsion," including (a) "[r]einstatement of [Plaintiff] to his [c]ommittee assignments;" (b) "[r]estoration of [Plaintiff's] seniority based on the original date of election to the House in November 2022;" (c) "[o]fficial acknowledgement of [Plaintiff's] service in the 113th [House] as a full year of general assembly service," for the purposes of Plaintiff's "qualification for and benefits under the" TCRS; and (d) "restoration of all other benefits of which he has or may have been deprived." (Doc. No. 52 at 59-60).[11]

As for declaratory relief,[12] Plaintiff seeks declarations that (1) "Defendants' expulsion of [Plaintiff] from the House violated the Constitution of the United States and of the State of Tennessee;" (2) "[Plaintiff's] . . . expulsion will not have any effect on his rights, privileges, or entitlements, up to and including loss of seniority, eligibility for committee appointments, or any

---

[11] A brief note on the relief requested by Plaintiff: in the SAC, Plaintiff does not specify whether the respective forms of requested relief are requested as to Defendants in their respective individual capacities, official capacities, or both. The Court construes the requests for injunctive and declaratory relief as directed to Defendants in their official capacities. *See e.g., Cmty. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd. Serving Belmont, Harrison & Monroe Cntys.*, 150 F. App'x 389, 401 (6th Cir. 2005) ("Just as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.,* his official capacity."). *See also Milligan v. United States*, No. 3:07-1053, 2008 WL 1994823, at *15 (May 2, 2008 M.D. Tenn.) (finding that because "any injunctive or declaratory relief could be obtained only from the defendant U.S. Marshals in their official capacities…the defendant U.S. Marshals, in their individual capacities, are improperly named in any claim for injunctive or declarative relief."); *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) ("individual (or personal) capacity suits do not seek to conform the State's conduct to federal law; rather, such suits seek recovery from the defendant personally."); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) ("such equitable relief could be obtained against [Defendant] only in his official, not his individual, capacity."). Here, the injunctive and declaratory relief plainly relates "only to the official[s'] job[s]" in question. *Belmont*, 150 F. App'x at 401.

[12] The Court need not resolve the conflict in views as to how to characterize declaratory relief. *Compare,* e.g., *Occupy Nashville v. Haslam*, 769 F.3d 434, 440 (6th Cir. 2014) (categorizing "a declaratory judgment" as "equitable relief") *with Sanders v. Louisville & N.R. Co.*, 144 F.2d 485, 486 (6th Cir. 1944) ("actions for declaratory judgment are sui generis[,] and the procedural remedy is neither legal nor equitable").

benefits or entitlements provided to Representatives of the Tennessee State Legislature;" and (3) that the "[2023 Special Session Rules] are unconstitutional, in violation of the First Amendment Right to Freedom of Speech of the U.S. Constitution and the Constitution of the State of Tennessee, and that the rules violate the U.S. Constitution's Due Process Clause for vagueness and overbreadth." (*Id.* at 59).

As for monetary relief, Plaintiff further seeks "nominal damages" for the alleged "violations of Plaintiff's constitutional rights under the First and Fourteenth Amendments to the U.S. Constitution and his civil rights under 42 U.S.C. § 1983." (*Id.* at 60, ¶¶ 137, 192). Plaintiff also seeks an award of "compensatory damages to Plaintiff according to proof at trial for damages resulting from the expulsion order and for damages based on Defendants' deprivation of Plaintiff's civil rights under Section 1983," and an award of costs and attorney's fees. (*Id.* at 60).

Defendants' Opening Brief first argues that the case should be dismissed under Fed. R. Civ. P. 12(b)(1) because (according to Defendants) the Court lacks subject-matter jurisdiction due to Plaintiff's lack of standing and because (again according to Defendants) Defendants enjoy state sovereign immunity. (Doc. No. 55-1 at 16-21).[13] Defendants then argue that Plaintiff's claim must be dismissed (presumably) under Fed. R. Civ. P. 12(b)(6) as barred by absolute legislative immunity (*Id.* at 21-25), or, alternatively, as barred by qualified immunity. (*Id.* at 25-26). In the event the Court elects not to dismiss the claims on these grounds, the Opening Brief finally argues that Plaintiff has failed to state a claim under Rule 12(b)(6) for any of his claims. (*Id.* at 26-34).

---

[13] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of ___") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

<u>LEGAL STANDARD</u>

As an initial matter, because the Opening Brief puts forward arguments for dismissal under both Rule 12(b)(1) and Rule 12(b)(6), it is important to clarify the respective Rules and frameworks under which the Court will be adjudicating the various arguments.

1. **<u>Potential Dismissal Pursuant to Rule 12(b)(1) and Rule 12(b)(2)</u>**

Defendants muster two arguments for why Plaintiff's claims should be dismissed (in whole or in part, respectively) purportedly under Rule 12(b)(1). Defendants argue that dismissal is appropriate because (according to Defendants) (1) Plaintiff lacks standing to bring his claims; and (2) Plaintiff's claims are barred in part by sovereign immunity.[14]

In fact, only the first of these two arguments is properly categorized as an argument under Rule 12(b)(1) in particular. Axiomatically, standing is "an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). *See also Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (citations omitted) (internal quotation marks omitted) ("Standing goes to [a c]ourt's subject matter jurisdiction"); *Allstate Ins. Co. v. Global Medical Billing, Inc.*, 520 F. App'x 409, 410-11 (6th Cir. 2013) (citations omitted) ("Although the parties and the district court considered the issue of standing as a failure to state a claim under Rule 12(b)(6), it is more properly considered an attack on the court's subject-matter jurisdiction under Rule 12(b)(1).").

Like any kind of challenge to subject-matter jurisdiction, a challenge specifically to the plaintiff's standing can be in the form of either a facial attack or a factual attack. *See Kale v. Procollect, Inc.*, 547 F. Supp. 3d 793, 796 (W.D. Tenn. 2021) ("Challenges to standing can be

---

[14] As will be discussed below, Defendants' arguments concerning state sovereign immunity are best categorized as made pursuant to Rule 12(b)(2) because they sound in personal jurisdiction rather than subject-matter jurisdiction.

facial or factual."); *In re Saffold*, 373 B.R. 39, 43 (Bankr. N.D. Ohio 2007) ("A challenge to standing may be either a facial attack on a pleading or a factual attack.").

"A facial attack on standing challenges the legal sufficiency of the complaint, whereas a factual challenge against standing questions whether the complaint's factual assertions reflect reality." *Shumway v. Neil Hosp., Inc.*, 570 F. Supp. 3d 585, 588 (W.D. Tenn.) (citing *Ohio Nat. Life Ins. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

A review of Defendants' standing arguments (Doc. No. 55-1 at 16-19) reveals that Defendants bring a facial rather than a factual challenge, in that they focus on the purported insufficiency of the allegations of the SAC to establish standing, as opposed to marshaling purported facts to establish a lack of standing. Notably, Defendants argue that Plaintiff's "alleged injuries are neither traceable to nor redressable by Defendants," that "Plaintiff has failed to allege any conduct at all traceable to Defendants Letzler, Trotter, and Hicks," and that "Plaintiff's alleged injuries are not traceable to [Defendant] Sexton, either." (*Id.* at 16, 17). Therefore, the Court will consider only the sufficiency of the SAC and will (subject to the exceptions that were anticipated in a footnote above and will be made apparent, consistent with that footnote, in the text below) "accept the allegations set forth in [the SAC] as true" with respect to the standing challenge. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x. 576, 579 (6th Cir. 2014).

But Defendants second above-listed argument—claiming Defendants' entitlement to Eleventh Amendment sovereign immunity[15]—though purportedly asserted under Rule 12(b)(1), is

---

[15] Defendants invoke sovereign immunity with reference to the Eleventh Amendment, which prescribes a certain kind of immunity for states. However, the concept of sovereign immunity predates the Eleventh Amendment. *See Laborers' Int'l Union of N. Am., Loc. 860 v. Neff*, 29 F.4th 325, 329–30 (6th Cir. 2022) ("When the States entered the federal system, they did so with their sovereignty intact."); *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 499 (2021) (quotation omitted). One feature of sovereignty is immunity from suit. *Id.* Whether reflected in the words of the Tenth or Eleventh Amendments or background principles to the Convention, sovereign immunity protects States and the Federal Government from

actually not properly conceived as one under that Rule, because it does not actually challenge subject-matter jurisdiction. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. There is some confusion within this Circuit as to whether this state sovereign immunity sounds in personal or subject-matter jurisdiction. *Compare Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) ("The sovereign immunity guaranteed by [the Eleventh] Amendment deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity") *with Ku v. State of Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003) (determining that "the immunity defense in cases otherwise falling within a federal court's original

---

litigation except in "limited circumstances." *Id.*; *see also Morgan v. Bd. of Pro. Resp. of the Supreme Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023) ("Eleventh Amendment sovereign immunity generally shields states from individuals suing them in federal court unless states waive their immunity or Congress removes it by statute.").

But as a practical matter, since the Eleventh Amendment's passage, the Sixth Circuit usually seems to analyze "sovereign immunity" and "Eleventh Amendment immunity" the same way, treating the latter as a version of the former. A reported Sixth Circuit opinion from a few of years ago is an outlier, taking a very different (not to say unpersuasive) approach by treating sovereign immunity and Eleventh Amendment immunity as entirely distinguishable, in various ways, including that the former but not the latter is waivable and that the former defeats personal jurisdiction while the latter defeats subject-matter jurisdiction. *See WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513–14 (6th Cir. 2021). But since then, the Sixth Circuit has (again) indicated (re)approval of its pre-*WCI* approach. For example, in *Morgan v. Bd. of Pro. Resp. of the Supreme Ct. of Tennessee*, 63 F.4th 510, 515, 518 (6th Cir. 2023), the court used the phrase "Eleventh Amendment sovereign immunity," 63 F.4th at 515, 518, which suggests that sovereign immunity and Eleventh Amendment immunity should be treated as the same thing. *See also Yoder v. Bowen*, 146 F.4th 516, 527 n.3 (6th Cir. 2025) (calling an argument "that the Eleventh Amendment bars Plaintiffs' suit" a "sovereign immunity argument"). And recently, the Sixth Circuit has made a statement that quite clearly suggests that the kind of immunity that the Eleventh Circuit provides *is* sovereign immunity. *Enbridge Energy, LP v. Whitmer*, 135 F.4th 467, 473 (6th Cir. 2025) ("Under the Eleventh Amendment, states generally have sovereign immunity from suit in federal court.").

Confronted with the unenviable task of choosing between a relatively recent, persuasive and ostensibly precedential case (*WCI*) and entirely conflicting line of precedential cases, the undersigned at this juncture feels constrained to follow the more voluminous and recent precedent and treat the two kinds of immunity as generally analytically indistinct from one another.

jurisdiction should be treated like the defense of lack of personal jurisdiction"). The Court here follows the lengthy line of cases in the Sixth Circuit holding that a sovereign immunity defense should be treated like a personal jurisdiction defense.[16] Thus, although Defendants bring their sovereign immunity defense under Rule 12(b)(1) as an attack on subject-matter jurisdiction, the Court construes Defendants' argument as an attack on personal jurisdiction better brought under Rule 12(b)(2).

Because the Court considers the sovereign immunity defense as properly brought under Rule 12(b)(2), it is important to briefly explain the framework for deciding 12(b)(2) motions. On a 12(b)(2) motion to dismiss, "district courts have discretion to either decide the motion on affidavits alone, permit discovery on the issue, or conduct an evidentiary hearing." *Elcan v. FP Assocs. LTD*, Case No. 3:19-CV-01146, 2020 WL 2769993, at *3 (M.D. Tenn. May 28, 2020) (citing *Inc. v. Imago Eyewear Pty., Ltd.*, 167 F. App'x 518, 520 (6th Cir. 2006)). Where, as here, the court rules without conducting an evidentiary hearing, the plaintiff's burden of proof is

---

[16] *See e.g., Ku*, 322 F.3d at 432, 434 (noting that "it appears that the Supreme Court is moving in the direction of concluding that, in cases where the district court otherwise has original jurisdiction over the matter, the Eleventh Amendment immunity defense should be treated in the same way courts have traditionally treated personal jurisdiction rather than as a matter of subject matter jurisdiction" and that "the Supreme Court has unequivocally rejected the view that, in cases over which the federal court otherwise has original jurisdiction, the additional 'jurisdictional bar' erected by the Eleventh Amendment should be treated as a matter of 'subject matter'); *Ruff v. Corr. Med. Servs.*, No. 07-15443-BC, 2009 WL 1384158, at *1 (E.D. Mich. May 13, 2009) ("In the Sixth Circuit, sovereign immunity is treated like the defense of lack of personal jurisdiction."); *Doe v. U.S. Dep't of Veteran Affs.*, No. 08-14958-BC, 2009 WL 2023663, at *2 (E.D. Mich. July 7, 2009) (granting a motion to dismiss based on the grounds of sovereign immunity under Rule 12(b)(2)); *Plain Loc. Sch. Dist. Bd. of Educ. V. DeWine*, 486 F. Supp. 3d 1173, 1187 (S.D. Ohio 2020) (quoting *Ku*, 322 F.3d at 432). *See also Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 282 (2023) (Gorsuch, J., concurring in part) ("Generally, questions about sovereign immunity do not go to a court's subject-matter jurisdiction (something a court must consider in every case even if the parties do not). Instead, questions of sovereign immunity usually go to a court's personal jurisdiction over a particular defendant. And as with other personal-jurisdiction defenses, a sovereign may waive its immunity and consent to judicial proceedings if it wishes.").

"relatively slight." *Id.* (quoting *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017)).

Nevertheless, "[i]n response to a motion to dismiss, the plaintiff may not stand on his pleadings, but must show the specific facts demonstrating that the court has jurisdiction." *Ramsey v. Greenbush Logistics, Inc.*, 263 F. Supp. 3d 672, 675 n.1 (M.D. Tenn. 2017) (quoting *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012)). "In other words, a 'plaintiff may not simply rest on the bare allegations of the complaint. But uncontroverted allegations must be taken as true, and conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.'" *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 583 (S.D. Ohio 2016) (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015)).

Moreover, when a district court rules on a motion to dismiss under Rule 12(b)(2) without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff. *Elcan*, 2020 WL 2769993, at *3. The Sixth Circuit has held that a court disposing of a Rule 12(b)(2) motion without an evidentiary hearing should not weigh the controverting assertions of the party seeking dismissal, because "we want to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (citation and quotation marks omitted), cited in *Elcan*, 2020 WL 2769993, at *3. "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction." *Id.* "In this procedural posture [without an evidentiary hearing], the court does not weigh the facts disputed by the parties but may consider the defendant's undisputed factual assertions." *Camps v. Gore Cap., LLC*, No. 3:17-CV-1039, 2019 WL 2763902, at *4 (M.D. Tenn. July 2, 2019).

It is not necessarily easy to reconcile all of the above-referenced rules with one another, because, at least superficially, they could be understood to say different things about the extent to which the district court must accept as true the allegations of the complaint. But the Court believes that they can be reconciled. And the upshot seems to be this: in opposing a motion to dismiss for lack of personal jurisdiction, a plaintiff cannot rely on mere allegations in the complaint, unless they are uncontroverted by the defendant-movant—in which case they can be accepted as true, as can the averments in the plaintiff's declarations (even if contradicted) and the defendant's undisputed factual assertions.

For the purposes of the present Motion, Plaintiff did not submit declarations or affidavits, and the Court did not hold an evidentiary hearing or permit discovery. Nevertheless, because Plaintiff's allegations in the SAC are "uncontroverted" by the defendant-movants, the Court accepts Plaintiff's allegations as true for the purposes of the Motion before the Court.

It is important to note that federal courts generally must decide jurisdictional issues before considering merits issues.[17] *See In re: 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016); *Amacher v. Tennessee*, No. 3:21-CV-00638, 2022 WL 141607, at *2 (M.D. Tenn. Jan. 14, 2022). A challenge to a plaintiff's standing under Article III of the Constitution is a challenge to subject-matter jurisdiction; Article III "[s]tanding is a jurisdictional requirement," and "[i]f no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tenn. Gen. Assemb. v. U.S. Dep't of*

---

[17] To their credit, Defendants intentionally sequence their arguments in just this manner, making the one for dismissal under Rule 12(b)(6) last. That is to say, they make their merits-based argument last. *See Miller v. Collins,* No. 23-3191, 2023 WL 7303305, at *4 (6th Cir. Nov. 6, 2023) ("[D]ismissals pursuant to Rule 12(b)(6) are 'judgment[s] on the merits[.]'" (quoting *Pratt v. Ventas, Inc*., 365 F.3d 514, 522 (6th Cir. 2004) (internal citation omitted))). Relatedly, Defendants make clear their (correct) view that their argument for dismissal under 12(b)(6) should be reached "[only] if this Court had jurisdiction, and [only] if Defendants were not immune." (Doc. No. 55-1 at 17).

It strikes the Court as especially important to make sure that challenges to (or doubts regarding) *subject-matter* jurisdiction in particular are resolved before merits-based challenges are addressed.

*State*, 931 F.3d 499, 507 (6th Cir. 2019). But Plaintiff also faces a challenge to personal jurisdiction, because (as noted above) Defendants have raised the defense of sovereign immunity, a defense that is in the nature of a challenge to personal jurisdiction. Presented with pending challenges to both its subject-matter jurisdiction and its personal jurisdiction, the Court may resolve them in either order, but challenges to a court's subject-matter jurisdiction that "involve no arduous inquiry" should be dealt with first to maintain efficiency in the federal court system. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587 (1999). Because the Court has determined that Defendants' standing challenge under Rule 12(b)(1) "involve[s] no arduous inquiry," (though it does involve a lengthy inquiry) standing will be addressed first in the Discussion section, followed by an examination of the personal jurisdiction issues raised by sovereign immunity and finally the merits-based arguments under Rule 12(b)(6) for those claims over which the Court may exercise jurisdiction. *Id.*

## 2. <u>Potential Dismissal Pursuant to Rule 12(b)(6)</u>

Defendants also seek dismissal of Plaintiff's claims under Rule 12(b)(6), asserting that (1) Plaintiff's claims are barred by legislative immunity;[18] (2) Plaintiff's claims are barred by qualified

---

[18] The question of whether legislative immunity is best raised as a challenge to subject-matter jurisdiction apparently has not been addressed directly by the courts in the Sixth Circuit. Some authority suggests that legislative-immunity defenses are best raised under Rule 12(b)(1) as (allegedly) divesting the Court of subject-matter jurisdiction. *Seum v. Osborne*, 348 F. Supp. 3d 616, 629 (E.D. Ky., 2018) (noting that defendants' 12(b)(1) motion "presents a facial attack on subject-matter jurisdiction" and that defendants "have not carried the burden of establishing legislative immunity."). *See also Rivera v. Saris*, 130 F. Supp. 3d 397, 402 (D.D.C. 2015) (noting that legislative immunity as it pertains to Congress's Speech or Debate Clause is "jurisdictional in nature."), *aff'd sub nom. Rivera v. Carr*, 672 F. App'x 14 (D.C. Cir. 2016).

With that said, district courts in this Circuit tend to treat legislative-immunity defenses as properly categorized under Rule 12(b)(6), and the Court herein does likewise. *See e.g., Peterson v. Dow*, No. 23-11401, 2024 WL 209699, at *2-3 (E.D. Mich. Jan. 19, 2024) (seeming to treat a legislative immunity defense as properly brought under Rule 12(b)(6) and Rule 56); *4th Leaf, LLC v. City of Grayson*, 425 F. Supp. 3d 810, 823-24 (E.D. Ky., 2019) (treating a legislative immunity defense as properly brought under 12(b)(6); *Bradley v. Mallory*, 871 F.2d 1087 (TABLE) (6th Cir. 1989) (treating a claim as properly dismissed for "failure to state a claim upon which relief can be granted" as "absolute [legislative] immunity" applied)); *Kent v. Ohio House of Representatives Democratic Caucus*, No. 2:20-CV-6419, 2021 WL 4399748, at *3-

immunity;[19] and (3) Plaintiff fails to state a claim on which relief may be granted. Because the Court ultimately concludes that it may exercise jurisdiction over some of Plaintiff's claims (thereby allowing the SAC to survive, in part, the standing analysis under Rule 12(b)(1) and the sovereign immunity analysis under Rule 12(b)(2)), a brief review of the 12(b)(6) standard is necessary.

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, or are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy

---

4 (S.D. Ohio Sept. 27, 2021) (analyzing an absolute legislative immunity claim under the 12(b)(6) framework), *aff'd*, 33 F.4th 359 (6th Cir. 2022).

[19] The Court understands Defendants' qualified immunity defense as being properly considered under Rule 12(b)(6), and not as a challenge to the Court's subject-matter or personal jurisdiction to be considered under Rule 12(b)(1) or Rule 12(b)(2). *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005) (a "reviewing court" may "dismiss under Fed. R. Civ. P. 12(b)(6) based on qualified immunity"). *See also Duren v. Byrd,* No. 1:18-CV-00084, 2021 WL 3848105, at *9 (M.D. Tenn. Aug. 26, 2021) ("[I]n noting that the defense of qualified immunity is prone to rejection when asserted as a 12(b)(6) or 12(c) motion, the Sixth Circuit makes clear that the defense indeed can be asserted in that manner.")

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

As discussed above, any of Defendants' arguments under Rule 12(b)(6) will be addressed only after Defendants' jurisdictional arguments are addressed in turn below.

<center>DISCUSSION</center>

### 1. **Standing Generally**

"Standing 'ensure[s] that federal courts do not exceed their authority' and 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Tenn. Gen. Assemb.*, 931 F.3d at 507 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "[A]s the party invoking federal jurisdiction," a plaintiff has the burden of establishing standing by alleging facts demonstrating that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[20] *Spokeo*, 578 U.S. at 338 (citations omitted). A plaintiff "*must* satisfy" this "three-part test for each injury that they allege, for each defendant that they sue, and for each remedy that they seek." *Bowles v. Whitmer*, 120 F.4th 1304, 1310 (6th Cir. 2024) (emphasis added) (citing *Fox v. Saginaw Cnty.*, 67 F.4th 284, 293 (6th Cir. 2023); *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022)). "Standing is to be determined as of the time the complaint is filed." *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (citation omitted) (internal quotation marks omitted).

Importantly, a plaintiff "cannot rely on general or conclusory allegations in support of its standing but instead must assert a plausible claim for why it has standing." *Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021).

---

[20] The Court notes that often "the questions of causation and redressability overlap." *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007) (Roberts, J., dissenting). Indeed, as the Sixth Circuit has noted, "[c]ausation and redressability are related elements of standing that have been frequently treated as one." *Kardules v. City of Columbus*, 95 F.3d 1335, 1352 (6th Cir. 1996). Thus, usually, "if a plaintiff can demonstrate that his injuries were caused by the defendant, the courts are in a position to redress the situation." *Id.* On the other hand, "the Supreme Court has treated these two requirements separately." *Id.* The upshot is that the Court must and does recognizes that the requirements are legally and conceptually distinct yet tend to go together in practical application.

As the parties correctly note, the key issue regarding standing, based on the pleading at issue here, is whether Plaintiff's alleged injuries are fairly traceable to each defendant. The issue— a defendant-specific one— may be referred to for short as whether there is "causation."[21]   To establish causation (or "traceability," as the Court sometimes refers to it below), a plaintiff must demonstrate a "'causal connection between the injury and the conduct complained of.'" *Vanderbilt Univ. v. Nat'l Lab. Rels. Bd.*, 759 F. Supp. 3d 812, 844 (M.D. Tenn. 2024) (quoting *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018)). A defendant's conduct "need not have a 'close connection' to the plaintiff's injury; rather it need only be 'fairly traceable' to the alleged injury." *Vanderbilt*, 759 F. Supp. 3d at 844 (quoting *Lexmark Int'l, Inc. v. State Control Components, Inc.*, 572 U.S. 118, 133 (2014)). In other words, "the causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the plaintiff need only

---

[21] Defendants argue that Plaintiff "lacks standing because his alleged injuries are neither traceable to nor redressable by Defendants." (Doc. No. 55-1 at 16). In so arguing, Defendants argue that Plaintiff "has failed to allege any conduct at all traceable to Defendants Letzler, Trotter, and Hicks." (*Id.* at 17). Defendants further argue that Plaintiff's alleged injuries "are not traceable to Speaker Sexton, either," but instead to the Tennessee "House as a whole." (*Id.* at 17-18). Defendants thus argue that these injuries, such as they are, are "not redressable by a judgment against the Speaker." (*Id.* at 18). As to Defendant Letzler, Plaintiff argues that as Clerk, she "removed Plaintiff from committee assignments and oversaw the unlawful administration of both sets of House Rules." (Doc. No. 58 at 14; Doc. No. 52 ¶¶ 12, 37–38, 149). As to Defendant Trotter, Plaintiff argues that "as Sergeant-at-Arms, [he] revoked Plaintiff's access to the Capitol and legislative parking garage." (Doc. No. 58 at 14; Doc. No. 52 at ¶¶ 13, 40). As to Defendant Hicks, Plaintiff argues that "as Assistant Clerk and Parliamentarian, [he] triggered the unlawful enforcement of both sets of House Rules." (Doc. No. 58 at 14; Doc No. 52 at ¶¶ 14, 81, 93–94). Plaintiff bases their standing argument as to Defendants Letzler, Trotter and Hicks almost entirely on the case *Durham v. Martin*, 905 F.3d 432 (6th Cir. 2018), because as Plaintiff's claim, "[p]laintiffs suing public officials can satisfy the causation and redressability requirements of standing by demonstrating a meaningful nexus between the defendant and the asserted injury. An official's enforcement of another's policy falls into this category." *Id.* at 434. (Doc. No. 58 at 14).

As to Defendant Sexton, Plaintiff argues traceability more directly and that Defendant Sexton "directly caused" "numerous violations of [Plaintiff's] constitutional rights." (Doc. No. 58 at 13). More particularly Plaintiff argues that the allegations make out claims that Sexton "led an illegal and unconstitutional effort" to expel Plaintiff from the House, "removed [Plaintiff] from all [his] committee assignments," held "expulsion proceedings against [Plaintiff]," "implemented the 2023 Special Session Rules," and "used the August 2023 Special Session Rule 18 to violate [Plaintiff's] right to free speech." (Doc. No. 58 at 13; Doc. No. 52 at ¶¶ 2, 36, 45, 66, 79).

allege 'injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). The *Durham* case is instructive here and holds that "'[p]laintiffs suing public officials can satisfy the causation and redressability requirements of standing by demonstrating 'a meaningful nexus' between the defendant and the asserted injury.'"[22] *Durham*, 905 F.3d at 434 (quoting *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). As *Durham* holds, "[a]n official's enforcement of another's policy falls into this category." *Id.*

An additional consideration, as discussed below, will be the appropriateness of injunctive relief or declaratory relief. A plaintiff who has "standing to bring a damages claim" does "not necessarily have standing to bring a claim for injunctive relief." *Fair Elections of Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014). The converse is also true. *Hange v. City of Mansfield, Ohio*, 257 F. App'x 887, 893 (6th Cir. 2007) ("Of course, even if a plaintiff lacks standing to pursue injunctive relief because he cannot establish either a likelihood of future injury or redressability, he may still have standing to pursue damages for the past injury he actually suffered."). As this Court has noted before, "a plaintiff asserting injunctive or declaratory relief"—like Plaintiff here— "'face[s] a higher burden; they must show actual or present harm or a significant possibility of future harm.'" *Amacher*, 2022 WL 141607, at *4 (quoting *Memphis A. Phillip Randolph Inst. v. Hargett*, 485 F. Supp. 3d 959, 977 (M.D. Tenn. 2020)). *Accord Nat'l Rifle Ass'n of Am. v. Magaw*,

---

[22] The rule quoted here is a good example of the manner in which, as discussed in a footnote above, the question of causation and the question of redressability tend to run together.

It is not lost on the Court that in many contexts, reasonable minds can disagree about what constitutes a "meaningful nexus" and whether a "meaningful nexus" exists in a particular case. Indeed, both the term "meaningful" and the term "nexus" can be subjective and nebulous, at least as applied in many contexts. Presented with such a context, a court is relegated to calling it like it sees it as to a "meaningful nexus."

132 F.3d 272, 279 (6th Cir. 1997) ("When seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review."). That is to say, a plaintiff must allege facts showing that he faces a threat of injury that is "real and immediate, not conjectural or hypothetical." *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted) (internal quotation marks omitted). Importantly, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

As "standing is not dispensed in gross," the Supreme Court has held that standing is claim-specific; that is, a plaintiff must have standing for each claim he pursues. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press."). *See also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018) (citations omitted) (internal quotation marks omitted) (noting that "standing is not dispensed in gross"); *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018) (citations omitted) (internal quotation marks omitted) ("A claimant bears the burden of establishing standing and must show it for each claim he seeks to press."); *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) ("A plaintiff must have standing for each claim pursued in federal court."); *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) ("[T]hat a plaintiff has standing to challenge one of a statute's provisions does not mean the plaintiff has standing to challenge all of them.").

A plaintiff must allege "how the requested relief against *each* of the defendants could redress [the plaintiff's] alleged injuries-in-fact." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022). In other words, standing is defendant-specific (even

though not plaintiff-specific). This principle is neither intuitive nor self-evidently reflected in the three elements of standing, but on second glance it well may be reflected in the requirement that the injury would be redressed by a favorable court decision—meaning a favorable court decision against the *particular defendant(s)* involved. *Lawson v. Hargett*, No. 3:24-CV-00538, 2024 WL 3867526, at *7 (M.D. Tenn. Aug. 19, 2024); *Ashe v. Hargett*, No. 3:23-CV-01256, 2024 WL 923771, at *5 (M.D. Tenn. March 4, 2024). To put it another way, a plaintiff must show that "a particular and concrete injury" is "caused by" the defendants and is "redressable by the courts." *Hagy*, 882 F.3d at 620. A plaintiff must show this "for each claim he seeks to press." *Id.* (citations omitted) (internal quotation marks omitted). Accordingly, the Court analyzes standing claim by claim, and Defendant by Defendant, below.[23] In so doing, the Court reiterates, it accepts as true the factual allegations related to standing.

a. Claim I

Claim I is based on an alleged violation of Plaintiff's rights under the First Amendment to the U.S. Constitution and Article I of the Tennessee Constitution by (1) Plaintiff's committee removals and GOC-seat denial; (2) Plaintiff's expulsion from the House; (3) the adoption of the 2023 Special Session Rules; and (4) the application to Plaintiff of the 2023 Special Session Rules and 2024 New Rules. (*Id.* at ¶¶ 124-137). Plaintiff further alleges that Defendants "intend to make or threaten to make ongoing use of the 2024 New Rules, or similar rules, to continue to . . . silence [Plaintiff] in future legislative sessions." (*Id.* at ¶ 134). Via Claim I, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

---

[23] As an initial note, the injuries here, and Plaintiff's liberal use of "Defendants" has made it difficult to parse to which Defendant(s) Plaintiff traces which injury. The Court has analyzed the SAC as best it can, while drawing to reasonable inferences in favor of the Plaintiff as required.

As discussed below, Plaintiff lacks standing to pursue this claim as to two of the four defendants for money damages and to any of the Defendants with respect to Plaintiff's requested injunctive and declaratory relief on this claim.

### i. Defendant Letzler

Plaintiff's sole allegation as to Defendant Letzler, generally and as relevant specifically to Claim I, is that Defendant Letzler, as Chief Clerk, informed Plaintiff of his removal from Plaintiff's House committees including the Government Operations Committee. (*Id.* at ¶ 37). The allegations as to Defendant Letzler do not otherwise implicate Plaintiff's other alleged injuries, i.e., those related to Plaintiff's expulsion from the House or those related to the 2023 Special Session Rules or 2024 New Rules. With respect to the committee removals, Plaintiff further alleges that it was "Defendant Sexton" who "removed Plaintiff" from his "committee assignments." (*Id.* at ¶ 36). The question is thus whether Defendant Letzler's letter informing Plaintiff of the committee removals constitutes the "enforcement of [Defendant Sexton's] policy" such that the committee removals can be traced to Defendant Letzler. *Durham*, 905 F.3d at 434.

The Court holds that this injury is not traceable to Defendant Letzler. Indeed, the SAC itself characterizes Defendant Letzler's communication as "informing" Plaintiff of the committee removals, as opposed to implementing or enforcing the committee removals. (Doc. No. 52 at ¶ 37). The Court's conclusion is reinforced by the reasoning in *Durham. Durham* concerned a suit by a former member of the Tennessee House, who after his expulsion from the House sued state administrators for "denying him certain retirement and healthcare benefits." 905 F.3d at 433. In *Durham*, the administrators in question possessed the "authority to enforce one set of consequences of that expulsion: whether [plaintiff] receives . . . benefits." *Id.* at 435. Here, Plaintiff does not allege that Defendant Letzler possesses such authority. Although Plaintiff makes broad

reference to Defendant Letzler's responsibilities, those referenced responsibilities do not include any authority to effectuate committee removals. (Doc. No. 52 at ¶¶ 12, 37-38). Instead, as far as the SAC indicates, Defendant Letzler merely informed Plaintiff of the committee removals. (*Id.* at ¶¶ 37-38). In his Response, Plaintiff attempts to recharacterize the SAC as alleging that Defendant Letzler "removed Plaintiff from committee assignments and oversaw the unlawful administration of both sets of House Rules." (Doc. No. 58 at 14). Those efforts are unavailing because nothing in the SAC supports that characterization. Accordingly, even taking all of the SAC's factual allegations as true, Plaintiff has failed to establish standing as to Defendant Letzler because he has not alleged facts showing that any of his purported injuries are traceable to her conduct. *Spokeo*, 578 U.S. at 338. Although the SAC contains numerous references to "Defendants," apparently in an attempt to implicate all Defendants in collective fashion, these sorts of conclusory allegations of wrongdoing by all defendants—devoid both of any differentiating between them or any factual allegations suggesting why all defendants can treated the same—is not sufficient to state a claim against any particular defendant. *See, e.g., Holdings v. Socotra Opportunity Fund, LLC*, No. CV-220-1329-MWF-PDX, 2022 WL 18284897, at *2 (C.D. Cal. Nov. 29, 2022) (dismissing numerous claims pursuant to Rule 12(b)(6) "because those claims improperly lump together several Defendants without differentiation as to their conduct."); *Courser v. Michigan House of Representatives*, 404 F. Supp. 3d 1125, 1140 (W.D. Mich. 2019), ("[a] complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." (quoting *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012)), *aff'd*, 831 F. App'x 161 (6th Cir. 2020)). Relatedly, Plaintiff "cannot rely on general

or conclusory allegations in support of its standing but instead must assert a plausible claim for why it has standing. . . ." *Glennborough,* 21 F.4th at 414.

As noted, the specific allegations made as to Defendant Letzler are insufficient to establish causation. Therefore, this claim as to Defendant Letzler must be dismissed for lack of standing.

### ii. Defendant Trotter

With respect to Defendant Trotter, as with Defendant Letzler, Plaintiff's allegations are sparse. The crux of Plaintiff's allegations against Defendant Trotter are that Defendant Trotter, as Seargent-At-Arms, enforced an order from Defendant Sexton to restrict Plaintiff's "access to the Tennessee Capitol building and to the legislative parking garage." (Doc. No. 52 at ¶ 40). But this enforcement by Defendant Trotter does not appear to be the basis of *any* of Plaintiff's claims, either Claim I or otherwise. (*Id.* at ¶¶ 124-201). Accordingly, even if the denial of access caused by Defendant Trotter's enforcement were a cognizable injury-in-fact, and even if this injury was traceable to Defendant Trotter and otherwise redressable by the Court, it cannot confer standing with respect to any claims against Defendant Trotter—because it is not an injury caused by any conduct that underlies any claim. And as discussed above, although the SAC makes numerous generalized allegations to Defendants as a whole, such allegations do not serve to implicate Defendant Trotter in particular or to contribute to a showing of standing with respect to Defendant Trotter. *Glennborough,* 21 F.4th at 414. Thus, this claim as to Defendant Trotter must be dismissed for lack of standing.

### iii. Defendant Hicks

With respect to Defendant Hicks, Plaintiff makes two allegations relevant to Claim I. First, Plaintiff alleges that Defendant Hicks, as Assistant Chief Clerk and Parliamentarian, "informed Defendant Sexton that [Plaintiff] had been ruled as 'out of order' twice and was subject to censure"

under the 2023 Special Session Rules. (Doc. No. 52 at ¶ 81). Second, Plaintiff alleges that Defendant Hicks and Defendant Sexton "abused their power by throwing out [Plaintiff's] proposed amendment to House Joint Resolution 810," under the 2024 New Rules. (*Id.* at ¶¶ 91, 93). Specifically, Plaintiff claims that Defendant Hicks "acting in his position as Assistant Chief Clerk, announced that Plaintiff's amendment was out of order and did not allow [Plaintiff] to speak on the amendment" under the 2024 New Rules. (*Id.*). Plaintiff thus appears to allege, in effect, an injury caused by Defendant Hicks's application to Plaintiff of the 2023 Special Session Rules and 2024 New Rules. (*Id.* at ¶ 136).

Defendants advance that the out-of-order rulings at issue with Defendant Hicks are "ultimately alleged to be made or sustained by others." (Doc. No. 55-1 at 17). That may be true enough, but this is insufficient to defeat standing because the Court "must accept the facts presented in [Plaintiff's] complaint as true and construe them in his favor." *Durham*, 905 F.3d at 434. Plaintiff alleges Defendant Hicks informed Defendant Sexton that Plaintiff was "subject to censure" and that it was Defendant Hicks (sometimes acting in concert with Defendant Sexton) who "[threw] out [Plaintiff's] proposed amendment," and "did not allow [Plaintiff] to speak on the amendment" under the 2024 New Rules. (Doc. No. 52 at ¶¶ 81, 91, 93). Here, as in *Durham*, even if it is true that another legislator (or the legislature as a whole) was the "ultimate reason" for the out of order rulings and for Plaintiff's purported silencing, "[w]e must accept the facts presented" by Plaintiff as true. *Durham*, 905 F.3d at 434. And "on those facts," *id.*, Defendant Hicks has the power—inferably on his own, though also through acting in concert with Defendant Sexton, (Doc. No. 52 at ¶ 93)—to rule Plaintiff in and out of order and otherwise prevent him from speaking during the legislative session. Plaintiff's allegations as to Defendant Hicks (unlike as to Defendant Letzler) allege the authority to enforce the application of the House rules at issue here, and

Defendant Hicks's conduct is traceable to the alleged injury of enforcing the House rules in violation of Plaintiff's rights under the First Amendment to the U.S. Constitution and Article I of the Tennessee Constitution. Thus, Claim I survives the standing analysis as to Defendant Hicks.[24]

### iv. Defendant Sexton

Plaintiff makes myriad allegations with respect to Defendant Sexton. As relevant to Claim I, Plaintiff alleges that to prevent Plaintiff from speaking, Defendant Sexton: removed Plaintiff from his committee seats (Doc. No. 52 at ¶ 36); intended to hold "expulsion proceedings against [Plaintiff]" (*id.* at ¶ 45); adopted and applied to Plaintiff the 2023 Special Session Rules (*Id.* at ¶¶ 66, 67); and applied the 2024 New Rules to Plaintiff. (*Id.* at ¶ 88).

As an initial matter, one injury at issue with respect to Claim I is Plaintiff's expulsion from the House, which the Court holds is not traceable to Defendant Sexton. The SAC itself alleges that it was the House as a whole, and not Defendant Sexton, that effectuated Plaintiff's expulsion from the House. (*Id.* at ¶¶ 2, 50, 51, 130). Thus, even to the extent that Plaintiff's expulsion from the House, along with any harms resulting from that expulsion, such as a loss of "seniority[] and retirement benefits," (*id.* at ¶ 136), constitute a violation of Plaintiff's rights under the First Amendment to the U.S. Constitution and Article I of the Tennessee Constitution, those injuries are not traceable to any Defendant before the Court. Instead, those injuries are traceable to the

---

[24] To the extent that Defendants contest that redressability exists with respect to these injuries, their argument actually is couched in terms of traceability. (Doc. No. 55-1 at 16, 18, 18 n. 17). Even so, the Court notes that the injuries that it finds are traceable to Defendants Sexton and Hicks are redressable by this Court through the monetary relief Plaintiff seeks. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 280 (2021). ("A single dollar often will not provide full redress, but the partial remedy satisfies the redressability requirement.")

Moreover, the parties do not contest that Plaintiff suffered a *past* injury, and the Court does not perceive that the SAC potentially fails to satisfy the injury-in-fact requirement. Because this particular requirement of standing is unchallenged, the Court will not assess it. *See e.g., Barber v. Charter T'ship of Springfield, Mich.*, 31 F.4th 382, 390, 390 n.5 (6th Cir. 2022) (noting that "[d]efendants only challenge the first prong, known as the 'injury in fact' requirement," and declining to analyze the other prongs of standing beyond a footnote where, "there is little doubt that the causation and redressability prongs are satisfied.").

"independent action of some third party," that is, the House, or some unnamed administrators responsible for determining seniority and retirement benefits, which are not before the Court. *Wuliger*, 567 F.3d at 796. And Plaintiff's expulsion from the House cannot be traced to Defendant Sexton merely *intending* to hold the expulsion proceedings; such intent on the part of any individual (even the Speaker of the House) is far removed from the actual expulsion. Plaintiff does not allege a traceable injury as to Defendant Sexton (or any of the other Defendants), based on his expulsion from the House under Claim I.

Plaintiff's allegations likewise do not plausibly suggest traceability to Defendant Sexton of any injury from the *adoption* of the 2023 Special Session Rules (or for that matter the 2024 New Rules), which Plaintiff claims also violated his rights. (Doc. No. 52 at ¶¶ 132-33). As has been judicially noticed, the 2023 Special Session Rules (and the 2024 New Rules) were adopted by the House as whole.[25] Thus, the adoption of the 2023 Special Session Rules (and the adoption of the 2024 New Rules to the extent Plaintiff attempts to allege this is an injury underlying Claim I), are not traceable to Defendant Sexton, but rather to the House as a whole.

Nevertheless, though Plaintiff fails to plead an injury traceable to Defendant Sexton from his expulsion from the House or from the adoption of the 2023 Special Session Rules, Plaintiff succeeds in satisfying the standing requirements both as to the application to him of the 2023

---

[25] Tennessee General Assembly, House Floor Session—1st Legislative Day—1st Extraordinary Session at 8:05 (Aug. 21, 2023), https://tnga.granicus.com/player/clip/28820?view_id=705 &redirect=true&h=70d48f42508633c75214628eff403d18; Jonathan Mattise, *New Tennessee House rules seek to discourage more uproar after highly publicized expulsions*, ASSOCIATED PRESS (Jan. 10, 2024), https://apnews.com/article/tennessee-house-rules-debate-7e9483d818e8e337a6b708dfe5f7f2b9 ("The Republican-run Tennessee House on Wednesday installed new rules limiting how long lawmakers can debate bills and restricting members deemed 'out of order' from speaking."); Vivian Jones, *Tennessee House adopts new rules setting strict debate limits, banning visual aids*, TENNESSEAN (Jan. 10, 2024), https://www.tennessean.com/story/news/politics/2024/01/10/tennessee-house-new-rules-adopted-on-debate-visual-aids-silencing-members/72174366007/ ("After nearly two hours of debate, the Tennessee House of Representatives formally adopted new rules Wednesday…[t]he controversial rules package also includes a measure allowing the House to silence members out of order during a House session. Members voted 70 to 19…to adopt the rules, first recommended by the House Rules Committee on Monday.").

Special Session Rules and 2024 New Rules and as to the committee removals and GOC-seat denial. With respect to the application of the 2023 Special Session Rules and the 2024 New Rules, again, although it may be true that some of the out-of-order rulings made by Defendant Sexton required the House to sustain them in order to punish Plaintiff with censure, (Doc. No. 52 at ¶ 82), for the Court to find that Plaintiff lacks standing on these grounds would be to conflate the requirements of traceability for *standing* with the requirements of traceability for *liability*. These two doctrines are not the same. *Wuliger*, 567 F.3d at 796. For purposes of the *standing* requirement, Plaintiff need allege only an "injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Id.* Plaintiff has done so here. Plaintiff's allegations suggest that the injury suffered through the application of the 2023 Special Session Rules and the 2024 New Rules are fairly traceable to Defendant Sexton, most particularly through his out-of-order rulings on August 28, 2023, (Doc. No. 52 at ¶¶ 79-87), through "unilaterally" using his power to "rule that [Plaintiff's] . . . question was out of order," (*id.* at ¶ 96), and through ruling Plaintiff out-of-order "no fewer than seven times" during the 2024 Session. (*Id.* at ¶ 91).

With respect to the committee removals and GOC-seat denial, Plaintiff also alleges conduct that is traceable to Defendant Sexton. (*Id.* at ¶ 87). As Plaintiff alleges, Defendant Sexton "removed [Plaintiff]" from his "committee assignments," and it is inferable from Plaintiff's allegations that it was Defendant Sexton who denied Plaintiff a "seat on the Government Operations Committee" after Plaintiff's return to the House. (*Id.* at ¶¶ 36, 87). Moreover, Plaintiff also alleges that Defendant Sexton's decision to strip Plaintiff of his committee seats was an act of "unjustified retaliation for [Plaintiff's] exercise of his First Amendment right to free speech." (*Id.* at ¶ 87). This is sufficient to allege an injury-in-fact that is traceable to Defendant Sexton.

*v. Injunctive and Declaratory Relief as to Defendant Hicks and Defendant Sexton*

Although Plaintiff has "standing to bring a damages claim" as to Defendants Hicks and Sexton, he does "not necessarily have standing to bring a claim for injunctive relief" as to Defendants Hicks and Sexton. *Fair Elections of Ohio*, 770 F.3d at 460 n.1. To support his claims for injunctive and declaratory relief under Claim I, Plaintiff must "show actual present harm or a significant possibility of future harm." *Nat'l Rifle Ass'n of Am.*, 132 F.3d at 279. As explained above, Plaintiff has plausibly alleged injuries under Claim I traceable to Defendants Hicks and Sexton only as follows: (i) injuries traceable to Defendant Sexton from Plaintiff's committee removals and GOC-seat denial; and (ii) injuries traceable to Defendants Hicks and Sexton from the application to Plaintiff of the 2023 Special Session Rules and the 2024 New Rules. Plaintiff argues that additional application of the 2024 New Rules (or similar rules) to him is imminent. Plaintiff alleges, sparsely, that "[t]he 2024 Session has demonstrated that Defendants intend to, and are ready and willing to, continue their violations of [Plaintiff's] constitutional rights in order to silence him," and that "Defendants intend to make or threaten to make ongoing use of the 2024 New Rules, or similar rules, to continue to prevent and silence [Plaintiff] in future legislative sessions from speaking." (Doc. No. 52 at ¶¶ 7, 134). Plaintiff does not appear to allege anywhere that a new removal from his committee seats is imminent. This will not do.

Plaintiff's meager allegations insinuating a risk of future harm are predicated wholly on "[p]ast exposure to illegal conduct." *O'Shea*, 414 U.S. at 495-96. Plaintiff has not plausibly suggested any "continuing, present adverse effects" as to his committee removals, GOC-seat denial, or the application to him of the 2023 Special Session Rules or the 2024 New Rules. *Id.* at

496.[26] Rather, Plaintiff has engaged in the kind of "'speculation'" that is "'insufficient to establish the existence of a present, controversy,'" necessary to permit this Court to exercise Article III standing. *Lyons*, 461 U.S. at 105 (quoting *Ashcroft v. Mattis*, 431 U.S 171, 172 n.2 (1977)).[27]

Accordingly, to the extent that Claim I makes a claim for injunctive and declaratory relief, it must be dismissed for lack of standing. To the extent that Claim I seeks relief in the form of nominal and compensatory damages, it may proceed.

### vi. Conclusion

Thus, Plaintiff has standing to bring Claim I only as to Defendant Hicks and Defendant Sexton, and only to the extent that he seeks monetary relief.

### b. Claim II

Claim II alleges that the 2024 New Rules are facially unconstitutional under Article I of the U.S. Constitution and Article I of the Tennessee Constitution. (Doc. No. 52 at ¶¶ 138-45). In bringing this claim, Plaintiff alleges that he suffered "excessive discipline" under the 2024 New Rules. (*Id.* at ¶ 142). Plaintiff further alleges that Defendants "intend to and will implement and enforce the New Rules or other, similar rules in future legislative sessions to further chill, silence, and prevent such constitutionally protected speech by [Plaintiff] and other Representatives with

---

[26] Although Plaintiff has adequately alleged continuing adverse effects with respect to his expulsion from the House and the corresponding loss of seniority and certain House benefits, this injury is not traceable to any Defendant before the Court, as discussed above. Moreover, as Plaintiff concedes, he was restored to his seat on the Government Operations Committee. (Doc. No. 52 at ¶ 39). After that restoration, the GOC-seat denial was of no further effect and thus could not (and did not) portend future harm to Plaintiff.

[27] Moreover, again, as the SAC seems to allege, Plaintiff was eventually restored to his seat on the Government Operations Committee. (Doc. No. 52 at ¶ 39).

whom they disagree." (*Id.* at ¶ 143). Under Claim II, Plaintiff seeks declaratory and injunctive relief.[28]

Claim II will be dismissed in its entirety for lack of standing. Here, because Plaintiff is making a claim for injunctive and declaratory relief, Plaintiff must "show actual present harm or a significant possibility of future harm." *Nat'l Rifle Ass'n of Am.*, 132 F.3d at 279. As discussed in connection with Claim I, Plaintiff fails to do this.

Under Claim II, Plaintiff alleges that "Defendants intend to and will implement and enforce the New Rules or other, similar rules in future legislative sessions to further chill, silence, and prevent such constitutionally protected speech by [Plaintiff] and other Representatives with whom they disagree." (Doc. No. 52 at ¶ 143). But again, there are only sparse allegations supporting this bald assertion. As noted above, Plaintiff alleges that "[t]he 2024 Session has demonstrated that Defendants intend to, and are ready and willing to, continue their violations of [Plaintiff's] constitutional rights in order to silence him," and that "Defendants intend to make or threaten to make ongoing use of the 2024 New Rules, or similar rules, to continue to prevent and silence [Plaintiff] in future legislative sessions from speaking." (*Id.* at ¶¶ 7, 134). As described above in connection with Claim I, this will not do and reflects an impermissible reliance by Plaintiff on "[p]ast exposure to illegal conduct" as a means of justifying forward-looking relief. *O'Shea*, 414 U.S. at 495-96.

Thus, Claim II will be dismissed in its entirety for lack of standing.

---

[28] As noted above, although it is somewhat unclear which of the requested relief goes to which claim, because Plaintiff couches Claim II as a request for "Declaratory Judgment that the New Rules are Unconstitutional under Article I of the U.S. Constitution, 42 U.S.C. § 1983" and makes explicit reference to the "declaratory and injunctive relief," sought in the SAC, the Court understands Claim II as only seeking declaratory and injunctive relief. (Doc. No. 52 at Second Claim for Relief, ¶ 145).

c. <u>Claim III</u>

Claim III alleges a violation of Plaintiff's right to procedural due process under the Fourteenth Amendment as a result of the (allegedly) infirm procedures underlying his committee removals, the GOC-seat denial, and his expulsion from the House, including a lack of adequate notice and opportunity to be heard and the denial of Plaintiff's right to an impartial hearing during that expulsion. (Doc. No. 52 at ¶¶ 146-70).[29] Under Claim III, Plaintiff seeks injunctive and declaratory relief and monetary relief.

With regard to procedural-due-process claims, "the allegedly infirm process is an injury in itself." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (internal citation omitted). And, as Plaintiff notes, deprivations of procedural due process are "actionable for nominal damages without proof of actual injury." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Accordingly, the Court conducts its Claim III standing analysis based on injury in the form of the allegedly infirm processes (i.e., procedures) at issue here, that is, those procedures (or lack thereof) underlying Plaintiff's committee removals, Plaintiff's GOC-seat denial, and Plaintiff's expulsion from the House (i.e., the lack of adequate notice and opportunity to be heard and the denial to Plaintiff of an impartial hearing during Plaintiff's House expulsion proceedings).

i. *Specific Defendants*

---

[29] Although not explicitly stated in the SAC, the Court understands Claim III to be a claim for the denial of Plaintiff's *procedural* due process rights under the Fourteenth Amendment because it attacks the procedure underlying the committee removals, the GOC-seat denial, and Plaintiff's House expulsion. This understanding mirrors the interpretation of Claim III put forward in Plaintiff's Response. (Doc. No. 58 at 13) (categorizing many of the allegations under Claim III as a "denial of Plaintiff's procedural due process rights.").

With respect to Defendants Trotter and Hicks, the infirm processes underlying Claim III are not fairly traceable to any of their conduct as alleged by Plaintiff. As noted above, as to Defendant Trotter, the allegations are cabined solely to his limitation of Plaintiff's "access to the Tennessee Capitol building and to the legislative parking garage." (*Id.* at ¶ 40). Moreover, as detailed above, the allegations against Defendant Hicks are related solely to the application to Plaintiff of the 2023 Special Session Rules and the 2024 New Rules. (*Id.* at ¶¶ 81, 91, 93). These allegations are entirely non-germane to Claim III and insufficient to allege standing as to these two Defendants.

With respect to Defendant Letzler, as detailed above, the injuries underlying Claim III, that is, the infirm processes, are not fairly traceable to any of her conduct. Injuries from the process for committee removals cannot be traced to Defendant Letzler merely "informing Plaintiff," (*id.* at ¶ 37), after the fact, of his committee removals. As further detailed above, Plaintiff makes no allegation that Defendant Letzler possessed the authority to "deny[] him" his committee assignments. *Durham*, 905 F.3d at 434-35. And as further stated above, although Plaintiff makes broad reference to Defendant Letzler's responsibilities, those references do not include any allegations as to her authority to effectuate (or otherwise establish the procedure for) the committee removals. (Doc. No. 52 at ¶¶ 12, 37-38). Indeed, according to the words of the SAC itself, Defendant Letzler merely informed Plaintiff of the decision to remove him from his committees. (*Id.* at ¶¶ 37-38). Even taking all of Plaintiff's factual allegations as true, Plaintiff has failed to establish standing as to Defendant Letzler for Claim III because he has not alleged facts showing that any of his purported injuries are traceable to her. *Spokeo*, 578 U.S. at 338.

Thus, Claim III will be dismissed for lack of standing as to Defendants Letzer, Trotter, and Hicks.

With respect to Defendant Sexton, however, Plaintiff does have standing to bring Claim III because the allegedly infirm processes underlying Plaintiff's committee removals and the GOC-seat denial are fairly traceable to Defendant Sexton. Per the SAC, Defendant Sexton "removed [Plaintiff]" from his "committee assignments." (Doc. No. 52 at ¶ 36). As Plaintiff avers, "[Plaintiff's] only notice or due process of any kind regarding the removal from his committee seats was the April 3, 2023 letter sent on Defendant Sexton's letterhead and signed by Defendant Letzler." (*Id.* at ¶ 38). Likewise, just as it is inferable from Plaintiff's allegations that it was Defendant Sexton who denied Plaintiff a "seat on the Government Operations Committee" after Plaintiff's return to the House, it is also inferable that it was Defendant Sexton who established the infirm process underlying the GOC-seat denial. (*Id.* at ¶¶ 87, 150). Plaintiff has thus pled that the allegedly infirm processes underlying Plaintiff's committee removals and the GOC-seat denial are fairly traceable to Defendant Sexton such that standing is established. *Wuliger*, 567 F.3d at 796.

Yet, with respect to the processes underlying Plaintiff's expulsion from the House (including the lack of adequate notice and opportunity to be heard and the denial of an impartial hearing to Plaintiff during that expulsion proceeding), Plaintiff does not have standing as to Defendant Sexton. These processes are not traceable to Defendant Sexton. The SAC reiterates time and again that it was the House, House leadership, or other members of the House, and *not* Defendant Sexton (or, for that matter, any other Defendant) personally, who established the offending procedures used during the expulsion proceeding. As the SAC claims, it was "House leadership" that "moved to suspend the House Rules to subject [Plaintiff] to trial-like conditions." (*Id.* at ¶ 155). It was under the suspension of the House Rules that Plaintiff was subject to the injuries in question. (*Id.* at ¶¶ 156-60). The SAC further states that it was "other members" of the

House that "voted to suspend debate . . . thus depriving [Plaintiff] of an opportunity to adequately defend himself." (*Id.* at ¶ 160). As the SAC further alleges, it was the "House, acting as a judicial body," that violated Plaintiff's rights. (*Id.* at ¶¶ 165-68). Thus, to the extent that Claim III is predicated upon the allegedly unconstitutional procedures used to expel Plaintiff from the House, these are injuries that result "from the independent action of some third party not before the court," i.e., the House, House Leadership or other House members, and are therefore not sufficient to give standing as to Defendant Sexton. *Wuliger*, 567 F.3d at 796.

### ii. Injunctive and Declaratory Relief

Again, however, this is not the end of the analysis. Because Claim III requests both injunctive and declaratory relief and monetary relief, and because the standing inquiry for injunctive relief is different from the standing inquiry for monetary relief, *Fair Elections of Ohio*, 770 F.3d at 460 n.1, the Court must examine whether Plaintiff has alleged "actual present harm or a significant possibility of future harm" to support his claims for injunctive and declaratory relief. *Nat'l Rifle Ass'n of Am.*, 132 F.3d at 279. Plaintiff has made no such allegations. Plaintiff here makes no allegations about an impending effort to strip him of his committee assignments a second time. Plaintiff makes no effort to plead a "real and immediate, not conjectural or hypothetical" injury that would justify injunctive or declaratory relief on this claim. *Lyons*, 461 U.S. 95 at 101-02 (citations omitted) (internal quotation marks omitted). Whatever purported "[p]ast exposure to illegal conduct" Plaintiff endured in suffering procedurally deficient committee removals is not sufficient to give rise to standing to seek injunctive or declaratory relief. *O'Shea*, 414 U.S. at 495-96.[30]

---

[30] Again, as noted above, the SAC seems to allege that Plaintiff was restored to his seat on the Government Operations Committee. (Doc. No. 52 at ¶ 39). Thus, there is no ongoing injury with respect to the committee assignments.

Accordingly, to the extent that Claim III seeks injunctive and declaratory relief, Plaintiff lacks standing to pursue that relief.

d. Claim IV

Claim IV alleges a violation of Plaintiff's right to procedural due process under the Fourteenth Amendment. (Doc. No. 52 at ¶¶ 171-82). More particularly, Plaintiff alleges that "as a result of his unconstitutional expulsion, [Plaintiff] temporarily lost health insurance coverage and will not have this year of public service count toward his retirement benefits." (*Id.* at ¶ 182). Under Claim IV, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

The SAC does *not* allege an injury from this alleged due process violation that is traceable to any of the Defendants in this case. To the extent that the SAC alleges any injury even conceivably traceable to any of the Defendants, the allegations are merely that "[o]n information and belief, Defendants have denied or intend to deny and refused to credit [Plaintiff] with his year of service in the 2023 legislative session because of his unlawful expulsion," and that "[o]n information and belief, Defendants have denied and are continuing to deny [Plaintiff] additional benefits and rights to which he is entitled to as a duly elected member of the House." (*Id.* at ¶¶ 180-81). As the SAC puts it another way, "[a]s a result of the illegal expulsion by Defendants and of being forced to be reappointed and then to run again for his seat in a special election—all of which is solely a result of Defendants' illegal expulsion of [Plaintiff] from the House—Defendants have determined [Plaintiff's] seniority not based on his 2022 election but instead based on the date of any special election in 2023, depriving him of at least one year of seniority to which he is entitled." (*Id.* at ¶ 119). The expulsion also "resulted in the ongoing deprivation of [Plaintiff's] duly earned retirement benefits." (*Id.* at ¶ 120).

As discussed at length above, to the extent that the injury underlying Plaintiff's claim is (as it appears to be) his expulsion from the House, this injury is traceable not to any Defendant herein, but rather to the House as a whole. And to the extent that the injury underlying Claim IV is the resulting denial of health insurance or the denial of other benefits, Plaintiff has made no allegations sufficient to trace this injury to any conduct by any particular Defendant(s). Although Plaintiff makes numerous references to collective and undifferentiated "Defendants" throughout the allegations underlying Claim IV, (*id.* at ¶¶ 120-21, 180-81), those references are insufficient to confer standing. To the extent that Plaintiff describes the official responsibilities of Defendants at all, (*id.* at ¶¶ 11-14), none of these responsibilities, as alleged, include "the authority to enforce" any decisions concerning Plaintiff's benefits or seniority. *Durham*, 905 F.3d at 435. Plaintiff "cannot rely on such general or conclusory allegations in support of its standing but instead must assert a plausible claim for why [he] has standing." *Glennborough,* 21 F.4th at 414. As for who is responsible for Plaintiff's purported denial of benefits, it is (as far as the SAC indicates) someone (or something) not before the Court—perhaps an unnamed benefits administrator or the House itself. *Cf. Durham*, 905 F.3d at 435 ("Here, the administrators were not responsible for [plaintiff's] expulsion from the legislature. But they do possess authority to enforce one set of consequences of that expulsion: whether [plaintiff] receives retirement and healthcare benefits. Their deciding not to pay these benefits created the injury that [plaintiff] seeks to remedy.").

Accordingly, Claim IV will be dismissed in its entirety for lack of standing.

    e.  <u>Claim V</u>

Claim V alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by subjecting Plaintiff to disparate treatment based on race. (Doc. No. 52 at ¶¶ 183-92). Claim V alleges that "Defendants denied equal protection to [Plaintiff] when they treated him

differently than they treated similarly situated white House members for the same conduct." (*Id.* at ¶ 185). Specifically, Plaintiff points to his expulsion from the House, Plaintiff's treatment on April 27, 2023, Plaintiff's denial of committee positions after his return to the House on April 10, 2023, the adoption and application to Plaintiff of the 2024 New Rules, and Defendant Sexton's refusal to acknowledge Plaintiff during two floor debates. (*Id.* at ¶ 186). Under Claim V, Plaintiff seeks injunctive and declaratory relief, as well as compensatory and nominal damages.

### i. *Specific Defendants*

As an initial note, once again with respect to Defendants Letzler and Trotter, Plaintiff's claim must be dismissed for lack of standing. Plaintiff does not allege any injury that is traceable to either of these Defendants. As discussed above, Plaintiff does not allege any facts suggesting that his committee removals or GOC-seat denial is traceable to Defendant Letzler. (Doc. No. 52 at ¶¶ 36-37). And the sole allegation as to Defendant Trotter, that he restricted Plaintiff's access to the Capitol, (*id.* at ¶ 40), is unrelated to the injury underlying this claim, which is concerned with Plaintiff's expulsion from the House, the denial of his committee positions, and the treatment of Plaintiff on the House floor. Thus, Claim V as to Defendants Letzer and Trotter will be dismissed.

With respect to Defendants Sexton and Hicks, however, Plaintiff again makes allegations sufficient to establish standing. As already discussed above, Plaintiff's injuries that resulted from the application of the 2024 New Rules to Plaintiff are fairly traceable to both Defendant Hicks and Defendant Sexton. Moreover, Plaintiff points to specific conduct by Defendant Sexton in particular, including the application of the 2024 New Rules to Plaintiff and a refusal to acknowledge Plaintiff on the floor of the House. (*Id.* at ¶¶ 186(d), 186(e)). Indeed, Plaintiff also points to the denial of a "committee position[ ] [that is, the GOC-seat denial] after his reinstatement to the House membership on April 10, 2023," which as previously discussed, the Court infers is

attributable to Defendant Sexton. (*Id.* at ¶¶ 38, 87, 186(c)).[31] Thus, Plaintiff has standing to pursue his Equal Protection claims against Defendant Hicks and Defendant Sexton at least for his requested relief of monetary damages.

### ii. *Injunctive and Declaratory Relief*

As noted above, this is again not the end of the analysis because Plaintiff seeks injunctive and declaratory relief in addition to monetary relief under Claim V. To the extent that Plaintiff seeks injunctive and declaratory relief to prevent future violations of his rights under the Equal Protection Clause, Plaintiff must allege "actual or present harm or a significant possibility of future harm.'" *Amacher*, 2022 WL 141607, at *4 (citations omitted) (internal quotation marks omitted); *Fair Elections of Ohio*, 770 F.3d at 460 n.1. Again, Plaintiff makes no efforts to show that there is a "significant possibility" of future violations of his rights under the Equal Protection Clause. *Amacher*, 2022 WL 141607, at *4. In connection with Claim V, Plaintiff makes virtually no effort to show future, impending harm. To the extent that Plaintiff does make such effort, it is via scattered allegations peppered throughout the SAC, which are generally based on purported "[p]ast exposure to illegal conduct." *O'Shea*, 414 U.S. at 495-96. (Doc. No. 52 at ¶¶ 7, 134). Because Plaintiff has not alleged facts plausibly suggesting a "real and immediate, not conjectural or hypothetical" injury as necessary to show standing for injunctive or declaratory relief on Claim V, the claim must be dismissed to the extent it seeks such relief. *Lyons*, 461 U.S. 95 at 101-02 (citations omitted) (internal quotation marks omitted).

In summary, Claim V will be dismissed as to Defendants Letzler and Trotter for lack of standing but survives the standing analysis with respect to Defendants Hicks and Sexton to the extent that the claim seeks monetary relief in nominal and compensatory damages.

---

[31] For the sake of brevity, the Court declines to reiterate here why neither Plaintiff's expulsion from the House nor the adoption of the 2024 New Rules are attributable to any of the named Defendants.

f.   Claim VI

Turning to Plaintiff's last claim, Claim VI asserts that Plaintiff's expulsion from the House "for constitutionally protected speech" constitutes a bill of attainder in violation of Article I of the U.S. Constitution. (Doc. No. 52 at ¶¶ 193-201). On Claim VI, Plaintiff appears to seek injunctive and declaratory relief, as well as compensatory and nominal damages.

Plaintiff lacks standing to pursue Claim VI. The SAC is clear that Claim VI is predicated on Plaintiff's expulsion from the House, which the SAC alleges "constitutes an unconstitutional bill of attainder." (*Id.* at ¶ 200). This expulsion, as discussed at length, is traceable not to any Defendant herein, but rather to the House as a whole. (*Id.* at ¶¶ 2, 50, 51, 130). Plaintiff alleges no "causal connection between the injury" (the expulsion from the House) and the "conduct complained of" on the part of Defendants. *Vanderbilt*, 759 F. Supp. 3d at 844 (M.D. Tenn. 2024).

The same is true to the extent that Plaintiff points to the "downstream consequences of that expulsion, such as the loss of committee assignments, seniority, and other benefits provided to members of the Tennessee legislature." (Doc. No. 52 at ¶ 201). To the extent that Plaintiff alleges that these consequences of the alleged bill of attainder constitute injuries in their own right, as discussed above those injuries are not traceable to any of the Defendants.

Thus, Plaintiff lacks standing to pursue Claim VI.

2. **Sovereign Immunity**

Before substantively addressing the sovereign-immunity issue, for the sake of clarity the Court first lists all of the claims that have survived the standing analysis at least in part and reiterates the extent to which each has survived.

1. Claim I – Survives as to Defendants Hicks and Sexton in their respective official and individual capacities for monetary relief.[32]

2. Claim III – Survives as to Defendant Sexton in his official and individual capacities for monetary relief.

3. Claim V – Survives as to Defendants Hicks and Sexton in their respective official and individual capacities for monetary relief.[33]

Because only claims as to money damages survive the standing analysis, the sovereign immunity analysis left to the Court is relatively straightforward.

 "Sovereign immunity protects states, as well as state officials sued in their official capacity for money damages, from suit in federal court." *Boler v. Early*, 865 F.3d 391, 409-10 (6th Cir. 2017) (citing *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005)).  "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which the defendant is an agent]." *Cady v. Arenac Cnty.*, 574 F.3d 334, 342 (6th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  Moreover, "[i]n the Sixth Circuit, sovereign immunity is treated like the defense of lack of personal jurisdiction." *Ruff v. Corr. Med. Servs.*, No. 07-15443-BC, 2009

---

[32] Defendants also argue that "[t]his Court lacks jurisdiction to adjudicate Plaintiff's state-law claims" because Plaintiff seeks to have this court instruct "state officials on how to conform their conduct to state law." (Doc. No. 55-1 at 19). As Defendants note, "[c]ase law is legion that the Eleventh Amendment [to] the United States Constitution directly prohibits federal courts from ordering state official to conform their conduct to state law." *Johns v. Sup. Ct. of Ohio*, 753 F.2d 524, 526 (6th Cir. 1985). Yet, the Court need not rule on this argument as none of those claims that survive the standing analysis seek injunctive relief requiring this court to order "state officials to conform their conduct to state law." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 97 (1984).

[33] Plaintiff's Response states that Plaintiff seeks "seeks nominal and compensatory damages from Defendants in their individual capacities, which would clearly redress completed injuries." (Doc. No. 58 at 14 n.7). It is unclear from this footnote whether Plaintiff is claiming to seek money damages from Defendants *only* in their individual capacities, or whether they are also seeking monetary damages from Defendants also in their official capacities. The SAC on balance indicates that Plaintiff seeks nominal and compensatory damages as to Defendants' individual *and* official capacities, and the Court proceeds accordingly.

WL 1384158, at *1 (E.D. Mich. May 13, 2009). Courts have generally found that sovereign immunity will not bar claims against a state "(1) when the state has waived immunity by consenting to the suit; (2) when Congress has expressly abrogated the states' sovereign immunity, and (3) when the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 [] (1908) applies." *Boler*, 865 F.3d at 410 (6th Cir. 2017).

Here, no party contends that Tennessee has consented or waived the defense of sovereign immunity as to this suit. (Doc. No. 55-1 at 10). *Compare Boler*, 865 F.3d at 410 (finding that "appearance in court to present certain defenses, such as a statute of limitations argument, is not a defense on the merits indicating a waiver of immunity," but noting that "engaging in substantial discovery, filing a motion for summary judgment, and only raising an Eleventh Amendment defense after an adverse ruling on the summary judgment motion," constituted consent). Nor does any party contend that Tennessee's sovereign immunity has been abrogated by Congress. *See also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66-67 (1989) (finding that Section 1983 did not abrogate the States' Eleventh Amendment immunity.).

That leaves only the *Ex Parte Young* doctrine, towards which the parties devote significant briefing. (Doc. No. 55-1 at 19-21; Doc. No. 58 at 16-18; Doc. No. 63 at 7-8). Yet, after the standing analysis above, the *Ex Parte Young* doctrine does not apply to the claims surviving the standing analysis, because the doctrine "does not extend to retroactive relief or claims for money damages." *Boler*, 865 F.3d at 412. *See also Horelick v. Lamont*, No. 3:21-CV-1431-MPS, 2023 WL 5802727, at *10 (D. Conn. Sept. 7, 2023) ("Because nominal damages are, of course, a form of damages . . . the *Ex Parte Young* exception does not apply to Plaintiff's claims for nominal damages.") (citations omitted). In this case, the only claims remaining are those for money damages. Accordingly, the *Ex Parte Young* exception does not apply.

In summary, because Plaintiff's only surviving claims are for money damages, and because sovereign immunity as to those claims has neither been waived by the State of Tennessee nor abrogated by Congress, Plaintiff's money damages claims as to Defendant Hicks and Defendant Sexton in their official capacity are barred by state sovereign immunity.

### 3. **Legislative Immunity**

Before turning to the legislative immunity analysis, the Court will first list all of the claims that have survived the standing analysis and sovereign immunity analysis at least in part and reiterates the extent to which each has survived.

1. Claim I – Survives as to Defendants Hicks and Sexton in their respective individual capacities for monetary relief.

1. Claim III – Survives as to Defendant Sexton in his individual capacity for monetary relief.

2. Claim V – Survives as to Defendants Hicks and Sexton in their respective individual capacities for monetary relief.

To put it another way, those claims arising out of Defendant Sexton's conduct with respect to Plaintiff's removal from and denial of his committee assignments, and Defendant Hicks's and Defendant Sexton's conduct with respect to the application to Plaintiff of the 2023 Special Session Rules and 2024 New Rules, are the only claims that survive to this stage of the analysis. The precise nature of Defendant Sexton's and Defendant Hicks's conduct is important to note before engaging in the legislative immunity analysis.

"Absolute [legislative] immunity protects lawmakers from lawsuits for their legislative acts." *Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 360 (6th Cir. 2022). Indeed, "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of

legitimate legislative activity.'" *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)).[34] It applies to "federal, state, and regional legislators," *Bogan*, 523 U.S. at 46, and affords legislators "immunity in § 1983 actions." *Kent*, 33 F.4th at 364. As both parties acknowledge, legislative immunity applies to individual-capacity claims. (Doc. No. 55-1 at 22; Doc. No. 58 at 21). To the extent that the parties disagree as to the scope of legislative immunity with respect to official-capacity claims (Doc. No. 58 at 21; Doc. No. 63 at 5-6), the Court declines to address that disagreement here, as only individual capacity claims remain before the Court.

Legislative immunity extends both to legislators and legislative "staff," and those "non-legislative officials who act in a legislative capacity." *Doe v. McMillan*, 412 U.S 306, 312 (1973); *Kent*, 33 F.4th at 364. Plaintiff does not deny that Defendants Hicks and Sexton hold roles which entitle them to legislative immunity, (Doc. No. 55-1 at 24; Doc. No. 58 at 19-20), and the Court accordingly treats Defendants Hicks and Sexton as holding roles that at least potentially entitle them to legislative immunity.

The parties have identified the crucial issue before the Court: whether the actions taken towards Plaintiff with respect to his committee assignments and with respect to the enforcement of the 2023 Special Session Rules and 2024 New Rules are properly categorized as "legislative acts," such that the conduct is covered by absolute immunity. (Doc. No. 58 at 19; Doc. No. 63 at 6). Whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. Interpreting *Bogan*, the Sixth Circuit has

---

[34] The Supreme Court has "generally . . . equated" legislative immunity for state legislators, which is derived from common-law immunity, and the legislative immunity provided by the Speech and Debate Clause to members of Congress. *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980). The case law at issue under both doctrines is used "interchangeably." *Kent*, 33 F.4th at 364.

identified two factors to consider when determining whether an official's acts "fall within the sphere of legitimate legislative activity." *Anders v. Cuevas*, 984 F.3d 1166, 1181 (6th Cir. 2021) (citing *Bogan*, 523 U.S. at 54). First, the court examines "whether a defendant's actions were legislative in form, *i.e.,* whether 'they were integral steps in the legislative process.'" *Anders*, 984 F.3d at 1181 (quoting *Bogan*, 523 U.S. at 55). Next, the court "must ask whether a defendant's actions were 'legislative in substance,' *i.e.,* whether the actions 'bore all the hallmarks of traditional legislation,' including whether they 'reflected . . . discretionary, policymaking decision[s] implicating the budgetary priorities' of the government and the services the government provides to its constituents." *Anders*, 984 F.3d at 1181-82 (quoting *Bogan*, 523 U.S. at 55-56). As in *Anders*, the "question before [the Court]," is whether Defendant Sexton's and Defendant Hicks's conduct with respect to the committee assignments and the application of the 2023 Special Session Rules and the 2024 New Rules was "legislative rather than administrative or executive." *Id.* at 1181.

Case law is generally clear that self-disciplinary actions, like those underlying the thus-far surviving claims, are legislative acts and that therefore those conducting them are entitled to legislative immunity. The Sixth Circuit has held that "excluding a representative" from a legislative caucus is "part and parcel" of the legislative process and thus covered by legislative immunity. *Kent*, 33 F.4th at 366. Similarly, in *Gamrat v. McBroom*, the Sixth Circuit held that the Michigan House voting to expel a member was a "legislative activity, regardless of any bad faith." 822 Fed App'x 331, 334 (6th Cir. 2020). And indeed, as Defendants point out, the Fourth Circuit has held explicitly that "a legislative body's discipline of one of its members is a core legislative act," entitled to legislative immunity. *Whitener v. McWatters*, 112 F.3d 740, 741 (4th Cir. 1997).[35]

---

[35] Defendants also correctly note that *Whitener* is widely cited in the Sixth Circuit. (Doc. No. 55-1 at 24 n.3).

These cases all seem analogous to the conduct at issue in this case. Indeed, as *Whitener* explained, "[a]s legislative speech and voting is protected by absolute immunity, the exercise of self-disciplinary power is likewise protected." *Id.* at 744. *See also Shields v. Charter Tp. of Comstock*, 617 F. Supp. 2d 606, 615 (W.D. Mich. 2009) (quoting *Whitener*, 112 F.3d at 744).

Plaintiff cites to three cases to argue that Defendants Hicks's and Sexton's conduct is not in fact legislative but is instead administrative or executive. None of the cases are availing. First, Plaintiff cites to *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980), for the proposition that activities by legislators or staff "in their enforcement capacities," are not covered by legislative immunity. (Doc. No. 58 at 19-20). In so doing, however, Plaintiff oversimplifies *Consumers Union* in a way to make it appear necessarily applicable here when in fact it is not. The enforcement authority in question in *Consumers Union* was the authority of judges to "initiate proceedings against attorneys"—an authority that extended "beyond that of adjudicating complaints filed by others and beyond the normal authority of courts to punish attorneys for contempt." *Consumers Union*, 446 U.S. at 724, 736. The conduct at issue in *Consumers Union* stands in stark contrast to the conduct here, which involves a legislator and legislative staff disciplining a member of the House *within* the House. To put it another way, Defendant Sexton's and Defendant Hicks's alleged conduct, even when viewed in the most favorable light to Plaintiff, is well within the "normal authority" of the legislature to punish "legislators" for violation of the rules. Joseph Story, Commentaries on the Constitution of the United States § 835 (discussing the power of Congress to set its own rules and noting that "the power to make rules would be nugatory, unless it was coupled with a power to punish for disorderly behavior, or disobedience to those rules.").

The second case that Plaintiff cites is *McAfee v. Cauthorne*, No. 2:21-CV-00033, 2022 WL 2118982 (W.D. Va. June 13, 2022). That case also is inapposite. In *McAfee* the challenged action concerned a vote to *terminate* an *employee*. *Id.* at *5. Those challenged actions here that survive the standing analysis are entirely different, concerning internal legislative actions designed to *punish a legislator* by stripping him of his committee assignments and otherwise enforcement of House rules.

Finally, Plaintiff cites a dissenting opinion. (Doc. No. 58 at 20) (quoting *Alia v. Michigan Sup. Ct.* 906 F.2d 1100, 1107 (6th Cir. 1990) (Wellford, J., dissenting)). This citation is unavailing, for two reasons. First, of course, the cited opinion is non-precedential. Second, even if Judge Wellford's opinion were precedential, it would do Plaintiff no good because it merely analyzes and summarizes *Consumers Union*—which, as explained above, is distinguishable from the instant case.

In light of the above-cited authority regarding legislative immunity, and because Plaintiff's cited cases are inapposite, this Court can come to only one conclusion: Defendant Sexton and Defendant Hicks are entitled to legislative immunity with respect to their conduct in disciplining Plaintiff. Irrespective of Defendants' "motive or intent," this "self-disciplinary power" is protected by legislative immunity. *Whitener*, 112 F.3d at 744.

Accordingly, the remainder of Plaintiff's till-now surviving claims under Claim I, Claim III, and Claim V will be dismissed. Because the Court concludes that absolute legislative immunity bars (the remainder of) these claims, the Court declines to consider Defendants' qualified immunity and failure-to-state-a-claim arguments.

CONCLUSION

The question for the undersigned is not what he thinks of how Plaintiff was treated in the events alleged in the SAC, but whether and to what extent Plaintiff's respective claims survive the instant Motion under applicable law. For various claim-specific and Defendant-specific reasons discussed above, each of the six claims is subject to dismissal in its entirety.

Therefore, the Motion (Doc. No. 55) will be **GRANTED** in full.

An appropriate corresponding order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE